

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00349-CR

APOLLO DURSHAUN GIPSON                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY
TRIAL COURT NO. 1373406R

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Apollo Durshaun Gipson appeals his convictions for aggravated assault with a deadly weapon, to-wit: a motor vehicle and for accident involving injury. In two issues, Gipson argues that the trial court erred by not conducting a formal competency inquiry and that the evidence is insufficient to support the jury's verdicts for either of his convictions. We will affirm.

---
[1]See Tex. R. App. P. 47.4.

## II. BACKGROUND

Amhad Hussein testified that during the late evening of June 5, 2013, he was working at Papaw's Food Mart, a convenience store in Fort Worth, when he heard "something . . . like a car accident" outside his store. Hussein said that when he went outside to investigate, he found a woman, later identified as Patricia Lovett, laying on the ground next to his car. Hussein recognized Lovett because she had been inside his store a few minutes earlier. Hussein asked Lovett whether she needed help, and Lovett said that she needed an ambulance. According to Hussein, police and paramedics arrived within minutes.

Hussein described what had happened to Lovett as a "[h]it and run" wherein Gipson drove into Lovett with his car. Hussein also said that his own car had been hit during the collision that injured Lovett but that there was very little damage to it. By Hussein's account, the reason that his own vehicle had very little damage was because "most of the hit" was absorbed by Lovett as she was sandwiched between Gipson's car and his own.

Hussein testified that he knew what had happened to Lovett because the events were captured on the surveillance camera from his store. While Hussein was on the stand, the State introduced and published for the jury the captured video from the surveillance camera.

In the video, Gipson parks his maroon Ford Taurus in a parking spot next to Hussein's car. Lovett and another person, later identified as Torre Webb, exit the vehicle and enter Papaw's while Gipson remains in his car. A short time

2

later, Lovett exits Papaw's and stands on the sidewalk in front of the store. Gipson then exits his vehicle, seemingly exchanging words with Lovett, and then gets back into his car. Shortly after that, Webb exits Papaw's and hands a cellphone to Lovett.

Lovett then appears to dial a number and begin to speak on the phone. Webb then gets into the back of Gipson's car. From there, Gipson again exits his vehicle, and he and Lovett seemingly exchange words again—all the while, Lovett is on the phone. Lovett also appears to be attempting to keep Gipson's car between them. That is, when Gipson approaches Lovett toward the front of the car, Lovett walks toward the back of it from the other side, and vice versa, when Gipson turns and approaches Lovett from the rear of the car, Lovett walks toward the front of it—at all times keeping the car between herself and Gipson.

Gipson then gets back into his car. In short order, Webb exits the car for good. Gipson then backs his car out of the parking spot, seemingly turning his car in the direction of Lovett, and then Gipson's car surges forward, striking Lovett. The impact appears to pin Lovett between Gipson's car and Hussein's car, and then Lovett disappears from view, falling between the vehicles. The video also clearly demonstrates that the impact shakes Hussein's car. Gipson then places his car in reverse and backs out of the parking lot, out of view of the surveillance camera. Lovett is partially propped up against Hussein's car and partially seated on the ground.

3

Lovett testified that she met Gipson while working as a prostitute. By Lovett's account, Gipson approached her in May 2013 and asked her if she "wanted to go with him because he had drugs and money." Lovett accepted. Lovett said that during this time, she was addicted to "crack cocaine and alcohol" and that her relationship with Gipson was one that included an exchange of sex for drugs. Lovett said that she quickly began to refer to Gipson as her "best" friend and that Gipson was "really nice" to her in the beginning. Lovett said that most of the couple's time was spent in Gipson's "maroon Ford Taurus," which Lovett said she had driven. She also said that she had never witnessed any mechanical problems with the car.

Lovett averred that on June 5, 2013, she and Gipson were "riding around . . . doing drugs[] and . . . drinking vodka." Lovett said that Gipson had acquired the money for the drugs and vodka from his grandmother, who lived in a nursing home. The money did not last and, according to Lovett, neither did Gipson's kindness. Lovett said that during the day, Gipson got angry about Lovett wanting to "go home" and that he struck her "maybe two times."

Having run out of money for gas, Lovett said that the couple picked up a friend named "Torre" Webb, who also went by the name of "Johnny," because he was willing to buy them gas in exchange for a ride to the store. Lovett described Gipson as being "jealous[]" of Webb because he knew that Lovett "liked Torre." When Webb got out of the vehicle at the store, Lovett and Gipson "had words" and "started arguing." According to Lovett, the tenor of Gipson's argument "really

4

terrified" her. Lovett said that when the three of them stopped at Papaw's, and once Webb had exited the vehicle, she also exited the vehicle. Lovett said that she felt "safe if [she stood] in front of the store." From there, Lovett said that she dialed 911. By Lovett's account, when Gipson saw her calling 911, he exited his vehicle and declared, "I'm going to f**k you — I'm going to f**k you up, or something, I'm going to hit you." Lovett said that she interpreted these comments as Gipson saying that he was going to hit her with his car. Lovett said that the next thing she knew, Gipson "backs up and he hits [her] with his vehicle." Lovett said that the impact "pin[ned her] to the [other] car." Lovett said that Gipson did not check on her but rather he "just drove off."

Lovett said that Gipson called her days later and apologized for hitting her, declaring that "he didn't mean to do it." But Lovett said that she did not believe him because he had told her he was going to hit her with his car and then he did. Lovett said that her impression was that Gipson was "trying to kill [her]." Lovett also said that she did not want to come to trial because she was terrified of Gipson but that she had been subpoenaed to appear. Lovett described how the impact of Gipson's vehicle caused her to have a broken leg in three places, a concussion, and abdominal trauma. Lovett said that she now walks with a limp. During her time on the stand, Lovett described the events in the video from Papaw's surveillance camera. The State also introduced and published pictures of Lovett after she had been placed in an ambulance shortly after the impact.

Fort Worth Police Officer Jeremy Keys testified that he responded to Lovett's 911 call. When Keys arrived, he found Lovett in obvious pain and unable to move, laying on the ground next to Hussein's vehicle. Keys also testified that Lovett appeared intoxicated. Keys averred that Lovett told her that Gipson had purposefully struck her with his car and had then driven off. Keys said that medical personnel also responded to Lovett's 911 call and that they transported Lovett to the ambulance using a stretcher.

After speaking with Lovett, Keys believed that Gipson had committed aggravated assault. Keys testified that the manner in which Gipson had used his vehicle to strike Lovett had caused Gipson's vehicle to become a deadly weapon and that the vehicle, when used in that manner, had the potential to cause serious bodily injury or death. Keys also viewed the video from the store's surveillance system. According to Keys, the video corroborated Lovett's statement that Gipson had purposely struck her with his vehicle and had then driven off.

Fort Worth Police Detective Gerard Gutierrez testified that he investigated Keys's report regarding Gipson. Gutierrez said that he interviewed Lovett at the hospital. Gutierrez said that Lovett identified Gipson in a photo lineup as the person who had struck her with his car and had then absconded without attempting to help her. Gutierrez also viewed the video from the store's surveillance system, and according to Gutierrez, the video corroborated Lovett's statement.

6

Charles Ellis testified for the defense. Ellis said that he had known Gipson for a few years and that he had driven Gipson's vehicle several times. According to Ellis, Gipson's vehicle had problems with its brakes. Ellis averred that Gipson's car was "hard to stop . . . when you sto[m]p on the brakes." On cross-examination, Ellis agreed that Gipson's car would in fact stop when pumping the brakes and that the last time he had driven the car was "two or three years" prior to trial.

Gipson testified in his own defense. Gipson stated that he and Lovett had been using drugs and drinking beginning early in the morning on June 5, 2015. Gipson also averred that he had run into Lovett with his car that night. By Gipson's account, his car had brake issues that were first identified by Webb. Gipson averred that the trio had stopped at a gas station in order to purchase brake fluid for that very reason prior to stopping at Papaw's. Gipson also said that he had attempted to have the issues with his brakes fixed two months prior to the incident.

Gipson said that he and Lovett had "a disagreement" earlier in the day because Lovett did not want him to "return her home to her sister," but Gipson said that he never threatened Lovett. Gipson said that as the trio stopped at Papaw's, the couple's "debate" continued outside the car. According to Gipson, once at Papaw's, Lovett told him that she had called the police. Gipson said that he got into his car and backed up, pretending to leave in hopes that Lovett would change her tone toward him. Gipson averred that Lovett's demeanor did not

7

change, so he put the car in drive and that the car "jerk[ed]." Gipson said that when he attempted to stop the car, it wouldn't initially stop. Gipson said that although it was a "close call" in his attempts to steer around Hussein's vehicle, he "had no idea" that his car had struck Lovett or Hussein's car.

Gipson said that he drove away because he believed that Lovett had called the police; because he feared the police discovering that he had "a package of dope" in his car with him; and because he did not "want to go back to jail for something like that." He said that he did not know that he had struck Lovett until Webb called him a short while later. Gipson said that he did not return to the scene because of his fear of the police and that he did not speak with Lovett until several days after the incident, when he apologized to her over the phone. Gipson said that after Webb called him, the next thing he knew, he awoke in a Walmart parking lot with "some more brake fluid . . . sitting in the car" next to him, but he did not remember purchasing the fluid. On cross-examination, Gipson averred, however, that after he drove off, he stopped to put brake fluid in the car and that while doing so, he checked his car "for any scratches or dents." But Gipson maintained that he did not know that he had hit Lovett.

Gipson said that the police arrested him several days after the incident. Gipson averred that he had given a statement to the arresting officer. Gipson agreed that in his statement, he told the arresting officer that he knew he had hit Lovett and that he did not stop to assist her because people had run out of the

8

store yelling and screaming at him. The State introduced and published the written statement to the jury. In the statement, Gipson wrote in his own handwriting that "when [he] pulled forward to ask [Lovett] to get in car and let[']s go, [his] brakes fail[ed] to apply [and] went straight to the floor without stopping [the] car before hitting my friend [Lovett]." The statement further read, "[A]lso my floor mat interfere[]ed with [the] gas pedal. I saw several people coming toward me/my car yelling & screaming at me, I panic[ed,] became discombobulated & confused. I dr[o]ve away because I felt that I was [in danger]."

Webb also testified. Webb said that he was leaving Papaw's and walking toward his mother's house when he heard Lovett being struck by Gipson's car. Webb said that he was with Lovett and Gipson just prior to the collision because Gipson had given him a ride to Papaw's. Webb averred that the three never made an intermediate stop between when Gipson picked him up and when they arrived at Papaw's. Webb said that Lovett and Gipson were having "a little argument" as they arrived.

According to Webb, Lovett never told him that she had called 911. Webb said that after he heard the impact and then looked and saw Lovett laying on the ground, he "came right back" to check on her. Webb said that he then left the area right as the ambulance arrived because he did not want to speak to police due to "being on a bun" and having "his own troubles." Webb said that he called and informed Gibson that Gibson had struck Lovett with his car. By Webb's

9

account, he had previously driven Gipson's car a "couple [of] times" and the car's brakes were "real bad."

Gipson's daughter, Apollonia Gipson, testified that she had driven Gipson's car on a "few" occasions and that on "one encounter," she had experienced brake issues. Specifically, Apollonia said that she once had to use the emergency brake in order to get the car to stop.

After both parties closed, the jury returned verdicts of guilty for aggravated assault with a deadly weapon, to-wit: a motor vehicle and for accident involving injury. After the punishment phase, the jury further found Gipson to be a habitual offender and assessed punishment at thirty years' incarceration. The trial court entered judgments accordingly, and this appeal followed.

## III. DISCUSSION

### A. Competency

In his first issue, Gipson argues that even though the trial court questioned Gipson's attorney regarding his competency, the trial court reversibly erred by not conducting a formal inquiry regarding his competency to stand trial. Gipson points to three items in the record to support his argument. First, Gipson points to a portion of this colloquy from a pretrial hearing:

[Defense Counsel]: [Gipson], the State's offered you 20 years, and you've rejected that offer; is that correct?

[Gipson]: I can't do 20 years.

[Defense Counsel]: That's not what I asked you.

Just did you want the 20 years or not?

10

[Gipson]:   No.

[Defense Counsel]:   Okay. So you're rejecting the 20[-]year offer, correct?

[Gipson]:   Yes, if that's what — yes, sir, if that's what —

[Defense Counsel]:   Listen to me. The offer is 20 years. You told me you didn't want it an hour ago.  But if you want it now, you can have it.  Do you want 20 years?

[Gipson]:   I want ten.

[Defense Counsel]:   No, that's not the question.

Do you want the 20[-]year offer?

[Gipson]:   I don't know — I don't know.  I don't know, sir.  I'm not understanding what's really going on.

THE COURT:   First of all, [Gipson], can you hear what he's saying?

I cannot hear what you're saying.

[Gipson]:  I'm not really understanding what's going on, man. They — they been having me here for a long time.  They talking about these years, and, you know, I can't pay for that — I — I can't afford that.

THE COURT:   Okay. All right.

[Defense Counsel]:   Can I finish?

THE COURT:   You may.

[Defense Counsel]:   [Gipson], the State's offered you 20 years in a plea bargain. Do you want the 20[-]year offer or not?  That's the only offer they're going to make you.

[Gipson]:  I'm not understanding.   I guess not.   I'm not understanding.

[Defense Counsel]:   What do you not understand about 20 years?

11

[Gipson]:   Twenty years, man.

[Defense Counsel]:   All your fingers and all your toes.

[Gipson]:   That's a long time. I don't — I just did that. I did a 20 year.

[Defense Counsel]:   That's not the question. The question is not whether it's too much time. The question is —

[Gipson]:   I ain't heard that.

[Defense Counsel]:   Listen to me.

Do you want to accept the State's offer, yes or no?

[Gipson]:   No.

The second item Gipson points to is this colloquy that occurred immediately after the colloquy just cited:

[Defense Counsel]:   Okay.  The second thing is, I told you here just a few minutes ago that since you're charged with two counts, two different crimes, one being aggravated assault, and one failure to stop and render aid or accident involving injury, whatever you want to call it, I told you that you had a right to require that the State try those individually.  In other words, they could — you could say pick one of these and try me on it.  I told you that, right?  Just not ten minutes ago.

[Gipson]:   Yes.  Yes, sir.

[Defense Counsel]:   Okay. I told you, you could say try me on one or the other.  Do you understand that?

[Gipson]:   I —

[Defense Counsel]:   Did we have that conversation?

[Gipson]:   Yeah.  We was talking about somewhere try —

[Defense Counsel]:   Try one or the other.

12

[Gipson]:   Yeah.

[Defense Counsel]:   And I told you that if you did that, the State would have to pick one, but then they could come back and they could try you on whichever one they didn't try you today, and they could ask the judge to stack the sentences?

[Gipson]:   Stack?

[Defense Counsel]:   One sentence run after the other one quits, if you want to separate them.   But if you try them together, the sentences will run at the same time.   Do you remember that conversation?

[Gipson]:   Yes, sir.

[Defense Counsel]:   Okay.   And you've agreed to let the State try both of these cases at the same time, knowing that whatever your sentence is, it's going to run at the same time, or concurrent.   Do you understand that?

[Gipson]:   Yes, sir.  Yes, sir.

[Defense Counsel]:   Is that what you want to do?

[Gipson]:   I guess, yeah.  What —

[Defense Counsel]:   Okay.   It's either yes or no.   It's like being pregnant.

[Gipson]:   I don't know what's going on — I'm not — yes.  Yes, sir.

[Defense Counsel]:   Do you understand that?

[Gipson]:   That's what they want to do, yes.

[Defense Counsel]:   All right.

13

Following these two colloquies, the trial court inquired of defense counsel, "[D]o you believe that your client is competent?" Defense counsel responded, "I do, Judge." Defense counsel elaborated by stating:

> And I've got a pretty good stack of court records. I haven't seen anything in there that has told me that [Gipson]'s not competent to stand trial. [Gipson]'s never told me that he — he never — he's never given me the impression he does not know what he's charged with, or that he's — he does not understand the circumstances. I've spent several times with him in the jail, both with myself, with an investigator, and the investigator's been to see him.
>
> I have also, at []Gipson's request, the last time I went and saw him in the jail, I got Judge Catalano to appoint a psychologist who's going to go see []Gipson in the jail tomorrow morning, before the trial starts since the court — this court has [its] docket call in the morning on Tuesday.
>
> And I asked the judge, he ordered the bailiffs to bring [] Gipson from the Green Bay facility down here so that the doctor can see him for competency purposes.
>
> I don't have any reason to believe that he will be incompetent, but I am having that done. So, that's what I would let the court know.

Based on this exchange, the third item that Gipson points to as evidence that the trial court erred by not conducting a formal competency inquiry is, as Gipson phrases it, the fact that his trial counsel "sought permission from the trial court to appoint a psychologist to conduct an examination." The record is silent as to whether this examination took place.

The State argues that the trial court did not abuse its discretion by determining through an informal inquiry that there was insufficient evidence to warrant a formal competency hearing regarding Gipson's competence to stand trial. We agree with the State.

14

### 1. Standard of Review

We review issues involving competency determinations for an abuse of discretion. *Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009), *superseded by statute on other grounds by Turner v. State*, 422 S.W.3d 676, 692 n.30 (Tex. Crim. App. 2013); *see also Crump v. State*, No. 06-14-00011-CR, 2014 WL 1410330, at *1 (Tex. App.—Texarkana Apr. 11, 2014) (mem. op., not designated for publication) (applying same standard of review to a trial court's implied ruling to not conduct competency inquiry). We may not substitute our judgment for that of the trial court; instead, we determine whether the trial court's decision was arbitrary or unreasonable. *Montoya*, 291 S.W.3d at 426. A trial court's firsthand factual assessment of a defendant's competency is entitled to great deference on appeal. *Ross v. State*, 133 S.W.3d 618, 627 (Tex. Crim. App. 2004).

### 2. Applicable Law

Due process requires that a criminal defendant be competent to stand trial. *Turner*, 422 S.W.3d at 689 (*citing Dusky v. United States*, 362 U.S. 402, 403, 80 S. Ct. 788, 789 (1960)); *see also Pate v. Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 838 (1966) (holding that a conviction obtained while defendant is legally incompetent violates due process of law); *McDaniel v. State*, 98 S.W.3d 704, 709 (Tex. Crim. App. 2003) (same). This constitutional requirement has been codified in chapter 46B of the Texas Code of Criminal Procedure, which describes the circumstances that require a competency determination and details

15

the procedures to be followed. Tex. Code Crim. Proc. Ann. arts. 46B.001–.171 (West 2006 & Supp. 2015). Under the statute, a defendant is presumed competent to stand trial and shall be found competent unless proven incompetent by a preponderance of the evidence. *Id.* art. 46B.003(b) (West 2006).

A person is incompetent to stand trial if the person does not have "(1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." *Id.* art. 46B.003(a); *see Dusky*, 362 U.S. at 402, 80 S. Ct. at 789; *Turner*, 422 S.W.3d at 683 n.11 (noting that a competent defendant possesses both criteria). Evidence relevant to these criteria includes whether a defendant has the capacity to (1) rationally understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify. Tex. Code Crim. Proc. Ann. art. 46B.024(1) (West Supp. 2015); *Morris v. State*, 301 S.W.3d 281, 286 (Tex. Crim. App. 2009).

The issue of a defendant's competence may be raised by either party's motion or by the trial court on its own motion. Tex. Code Crim. Proc. Ann. art. 46B.004(a) (West Supp. 2015). "If evidence suggesting the defendant may be

16

incompetent to stand trial comes to the attention of the court, the court on its own motion shall suggest that the defendant may be incompetent to stand trial." *Id.* art. 46B.004(b). Upon a suggestion that the defendant may be incompetent, the trial court has a duty to conduct an informal inquiry to determine whether there is "some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." *Id.* art. 46B.004(c); *Lopez v. State*, 04-12-00568-CR, 2013 WL 6533183, at *3–4 (Tex. App.—San Antonio Dec. 11, 2013, no pet.) (mem. op., not designated for publication).

An informal inquiry does not have to be exhaustive. It may be satisfied when the trial court poses simple questions to the defendant or defense counsel regarding the defendant's competency. *See generally Luna v. State*, 268 S.W.3d 594, 598–600 (Tex. Crim. App. 2008), *cert. denied*, 558 U.S. 833 (2009); *Jackson v. State*, 391 S.W.3d 139, 142 (Tex. App.—Texarkana, no pet.); *Gray v. State*, 257 S.W.3d 825, 829 (Tex. App.—Texarkana 2008, pet. ref'd). In making its informal inquiry, the trial court is not required to follow any specific protocol. *See, e.g., Teal v. State*, No. 01-10-00506-CR, 2011 WL 6140676, at *2 (Tex. App.—Houston [1st Dist.] Dec. 8, 2011, pet. ref'd) (mem. op, not designated for publication) ("As its name suggests, an 'informal inquiry' does not have specific formal requirements."). If a trial court's informal inquiry establishes that there is some evidence that could rationally support a defendant's incompetency to stand trial, it should then conduct a formal competency trial. *Turner*, 422 S.W.3d at 696.

17

### 3. Informal Inquiry into Gipson's Competency

Here, the trial court conducted an informal inquiry regarding Gipson's competence to stand trial by posing questions to defense counsel and through its firsthand factual assessment of Gipson's competency. As discussed above, Gipson points to three items that he alleges amount to evidence of his incompetence.

First, Gipson argues that his statements that he was "not understanding" the State's offer of twenty years is indicative of his incompetence. But a reasonable interpretation, when viewing the exchange in its entirety, is that what Gipson did not understand is how the State would not offer less than twenty years. As Gipson stated himself, he "want[ed] ten" years. A defendant's dissatisfaction with a potential lengthy sentence, however, is not evidence that he is incompetent to stand trial. *See Anderson v. State*, No. 03-09-00041-CR, 2010 WL 3370054, at *6 (Tex. App.—Austin Aug. 26, 2010, pet. ref'd) (mem. op., not designated for publication) ("Anderson's conduct and comments were neither bizarre nor evidence of confusion or uncertainty . . . . Rather, they demonstrate frustration with the process and dissatisfaction with a longer sentence than anticipated.").

Second, Gipson's purported confusion over whether to require the State to try the two charges separately or together is not necessarily evidence that Gipson did not possess sufficient present ability to consult with his attorney, nor is it evidence that he lacked a factual understanding of the proceedings against

18

him. Indeed, within the colloquy that Gipson points to as evidence that he did not understand the joinder of the charges against him, Gipson affirmatively acknowledged that his attorney had discussed the concept with him and that he understood that the charges against him would be tried together. Furthermore, the trial court was free to interpret Gipson's ramblings as his continued frustration with what he believed to be an unfair plea offer from the State. *See Lawrence v. State*, 169 S.W.3d 319, 322–23 (Tex. App.—Fort Worth 2005, pet. ref'd) (noting defendant's rambling and nonresponsive answers to questions did not constitute evidence of incompetency).

Gipson's third assertion—that his trial counsel requested a competency evaluation at Gipson's request—is also not sufficient evidence that the trial court abused its discretion by not conducting a formal competency inquiry. *See McDaniel v. State*, 98 S.W.3d 704, 710 (Tex. Crim. App. 2003) (holding that under predecessor statute, the mere filing of a motion for competency examination was insufficient to require formal competence inquiry). Significantly, the trial court had direct evidence, in the form of testimony from Gipson's attorney, that Gipson's trial attorney had no concerns that Gipson possessed competency to stand trial. Most importantly, Gipson points to no evidence in the record that he did not rationally understand the State's charges and their potential consequences; that he was unable to disclose pertinent facts, events, or states of mind related to the State's charges; that he was unable to engage in reasoned choices or legal strategies and options; that he did not understand the

19

adversarial nature of the criminal proceedings; that he exhibited inappropriate courtroom behavior; or that he had an inability to testify. In fact, Gipson demonstrated a lucid understanding of the difference between the State's offer of a twenty-year sentence versus his desire for a ten-year sentence, and he testified in his own defense at trial, where he ably answered questions, both on direct and cross-examination, regarding his recollection of the events and his position that he never intended to run his vehicle into Lovett.

Because the trial court concluded through its informal inquiry that there was insufficient evidence of Gipson's incompetency to stand trial, we hold that it was not required to conduct a formal competency hearing and did not abuse its discretion when it did not do so. *See* Tex. Code Crim. Proc. Ann. art. 46B.005 (West 2006); *see also Jackson*, 391 S.W.3d at 142 (concluding trial court's inquiry to defense counsel, coupled with its own observations of defendant, constituted sufficient informal inquiry into defendant's competence). We overrule Gipson's first issue.

### B. Sufficiency of the Evidence

In his second issue, Gipson argues that the "evidence presented at trial was factually insufficient to support both guilt/innocence verdicts." In analyzing this point, Gipson cites outdated and overturned sufficiency standards. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126, 131–32 (Tex. Crim. App. 1996)); *see also Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006) (applying evidentiary

sufficiency review standards predicated on *Clewis*). The State argues, among other arguments, that this court should hold that Gipson has forfeited his arguments on appeal because he cites to outdated evidentiary sufficiency standards. While we agree that Gipson has cited and analyzed this issue under overturned precedent, we nonetheless interpret Gipson's challenges as being challenges to the sufficiency of the evidence to support both of his convictions. Thus, we will address his second issue.

## 1. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.

21

Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013); *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by

the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Dobbs*, 434 S.W.3d at 170; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

### 2. Aggravated Assault With a Deadly Weapon

In part of his second issue, Gipson argues that the evidence is insufficient to support his conviction for aggravated assault with a deadly weapon, to-wit: a motor vehicle. Gipson's specific argument is that "the great weight of the evidence defies the jury's finding regarding [Gipson]'s mental state under count one." We conclude that the evidence supports the jury's verdict.

Here, the State charged Gipson with having "intentionally or knowingly" caused bodily injury to Lovett by "striking her with a motor vehicle" while using or exhibiting "a deadly weapon during the commission of the assault, to-wit: a motor vehicle." Thus, the State was required to prove that Gipson committed the offense of aggravated assault with a deadly weapon when he "intentionally and knowingly" caused bodily injury to Lovett by driving his car into her. *See* Tex. Penal Code Ann. § 22.01(a)(1) (West Supp. 2015), § 22.02(a)(2) (West 2011).

In determining the sufficiency of the evidence to show intent and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such

23

conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). Further, a culpable mental state can be inferred from the acts, words, and conduct of the accused. *Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Conduct itself is sufficient to infer intent. *Connell v. State*, 233 S.W.3d 460, 467 (Tex. App.—Fort Worth 2007, no pet.).

Viewing the evidence in the light most favorable to the jury's verdict and drawing reasonable inferences from the basic facts to ultimate facts, the record shows that Gipson intentionally or knowingly drove his car into Lovett after he told her that he was going to "f**k [her] up" and then proceeded to get into his car, back up his car, steer his car toward her, and then accelerate his car into her, pinning her between his car and Hussein's. We hold that the evidence is sufficient to support the jury's determination that Gipson "intentionally or knowingly" caused bodily injury to Lovett while using his car as a deadly weapon. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170. We overrule this portion of Gipson's second issue.

### 3. Leaving the Scene of an Accident Involving Injury

In the remainder of his second issue, Gipson argues that the evidence is insufficient to support the jury's verdict that he "intentionally or knowingly" left the

24

scene of an accident involving injury (failure to stop and render aid).[2] Specifically, Gipson argues that "the great weight of the evidence regarding the lack of physical damage to both [his and Hussein's] cars and [his] severe intoxication" demonstrate that he did not have "knowledge of the accident." We conclude that the evidence is sufficient to support the jury's verdict.

A person commits the offense of failure to stop and render aid if he operates a vehicle "involved in an accident resulting in" the injury or death of another person and he intentionally or knowingly fails to stop and render reasonable assistance. Tex. Transp. Code Ann. §§ 550.021, .023 (West 2011); *Steen v. State*, 640 S.W.2d 912, 914–15 (Tex. Crim. App. 1982). The State satisfies its burden of proving mental culpability for failure to stop and render aid after a motor vehicle accident by showing that the accused had knowledge of the

---

[2]The trial court's judgment reflects that a jury found Gipson guilty under section 550.021 of the Texas Transportation Code. *See* Tex. Transp. Code. Ann. § 550.021 (West Supp. 2015). This statute is titled "Accident Involving Personal Injury or Death." *Id.* Given the history of the statute, reviewing courts, however, routinely refer to the offense under section 550.021 as "failure to stop and render aid." *Huffman v. State*, 267 S.W.3d 902, 904 (Tex. Crim. App. 2008); *see also Delacruz v. State*, Nos. 02-13-00048-CR, 02-13-00049-CR; 2014 WL 1389543, at *1 (Tex. App.—Fort Worth Apr. 10, 2014, pet. ref'd) (mem. op, not designated for publication) ("The trial court additionally convicted Delacruz of failure to stop and render aid under transportation code section 550.021(c)(2)."). This is so because the statute instructs what an operator of a vehicle involved in an accident that is reasonably likely to have caused injury or death to a person must do—stop and render aid. *See Huffman*, 267 S.W.3d at 908 ("[W]e have held that a separate prosecution for *failure to stop and render aid* can occur for each individual injured in the accident whom the defendant fails to aid.") (emphasis added).

circumstances surrounding his conduct. *St. Clair v. State*, 26 S.W.3d 89, 98 (Tex. App.—Waco 2000, pet. ref'd).

Here, viewing the evidence in light most favorable to the jury's verdict, the record shows that Gipson intentionally struck Lovett with his vehicle, pinning her to Hussein's car, and then drove away without offering her assistance. This view of the evidence is reinforced not only by Lovett's testimony but also by Gipson's written statement to the police that he had struck Lovett with his car and by his own testimony that after he left the scene, he stopped and inspected his car for "scratches or dents." Further reinforcing this evidence was (1) Webb's testimony that he called Gipson shortly after the collision and told him that he had injured Lovett with his car and (2) Gipson's own testimony that the reason he did not return even then was his fear of police involvement. *See Jackson v. State*, 643 S.W.2d 521, 523 (Tex. App.—Fort Worth 1982, pet. denied) ("Flight is a circumstance that tends to show guilty consciousness."). We hold that the evidence is sufficient to support the jury's determination that Gipson had knowledge of the circumstances surrounding his conduct of intentionally or knowingly failing to stop and render reasonable assistance to Lovett after operating his car in a way that resulted in injury to her. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Temple*, 390 S.W.3d at 360. We overrule the remainder of Gipson's second issue.

## IV. CONCLUSION

Having overruled both of Gipson's issues, we affirm the trial court's judgments.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  January 14, 2016